**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **AMBER SCHMIDT MEDINA, et al.** | § | |
| | § | |
| **VS.** | § | **NO. A-19-CV-109-RP** |
| | § | |
| **PARKSIDE LENDING LLC, et al.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court are Defendants Parkside Lending LLC and Cenlar FSB's Amended Motion to Dismiss First Amended Complaint (Dkt. No. 55); Plaintiffs' Response (Dkt. No. 57); and Defendants' Reply (Dkt. No. 58). The District Court referred the Motion to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.[1]

### I. BACKGROUND[2]

This suit involves a foreclosure. Amber Medina and her parents Pamela and Jerome Schmidt were the record owners of real property located at 108 Plantain Drive, Hutto, Texas 78634. Medina lived in the property, and her income was supplemented by her parents. All Plaintiffs are borrowers under a Promissory Note in the amount of $215,650 dated March 17, 2016, which was secured by a deed of trust against the Property. Under the current deed of trust, Defendant Parkside is the mortgagee or mortgage servicer and Defendant Cenlar is the current mortgage sub-servicer.

---

[1]Judge Pitman dismissed the claims against Albertelli Law and Angela Zavala on May 20, 2020 (Dkt. No. 69), so the only remaining defendants are Cenlar and Parkside.

[2]The Background is taken from Plaintiffs' First Amended Complaint. Dkt. No. 22

In July of 2017, Plaintiffs entered into a loan modification agreement. Plaintiffs fell behind on the loan in March of 2018. Plaintiffs allege they did not receive any verbal or written contact from Defendants once their mortgage account was declared past due. Medina stopped receiving mail correspondence from Parkside beginning in the early months of 2018 but was able to access her online account up until April of 2018. Medina asserts she was "locked out" of her online account from May 2018 through October 2018, because of nonpayment and was given a customer service phone number to contact. Medina pleads she could not locate any information during this time regarding reconciling her overdue account or other contact information specific for delinquent borrowers of Parkside on its main website.

On August 1, 2018, Medina contacted Parkside via the customer service phone number listed on the "locked out" account page, and spoke with representative Goodwin, who told Medina that her account was in foreclosure as of that day. Medina asked Goodwin her options to rectify her account and was told that she could stop the foreclosure if she completed a loss mitigation packet, which Goodwin would send to Medina at the Property address that same day in the mail. Goodwin also informed Medina of the name of the attorney assigned the foreclosure of the Property. Medina contacted the attorney, who told her that her firm did not have a file started for Medina's account yet, and to follow through with the mortgage company about stopping the foreclosure.

As of August 24, 2018, Medina still had not received a loss mitigation packet or any other correspondence from Parkside, and still did not have access to her online account information. Through Parkside's general online inquiry portal on its website, Medina sent a written message inquiring about the location of the loss mitigation packet and requesting the packet be resent immediately. She included the account number and her contact information, in addition to a request

for information about the loss mitigation packet and error notification about not receiving mail correspondence in a timely manner. Parkside's representative emailed Medina on September 7, 2018, stating that her request had been forwarded to the appropriate department and that Parkside's records indicated that a packet was mailed to Plaintiff on August 1, 2018. The representative also stated that a replacement packet would be sent to Medina at the address on record (the Property). The representative did not provide Medina with any particular address to use when mailing her communications to Parkside.

On September 10, 2018, Medina again contacted Parkside via Parkside's general online inquiry portal to state that she had still not received a loss mitigation packet. Medina offered an alternative address, a fax number, and an alternative work email address, with the request that the packet be faxed, emailed, or sent via FedEx to Medina at the alternative address immediately. Parkside's representative replied to Medina's second online request with the exact same reply as before, and without notifying Medina that the foreclosure process was already initiated.

Medina reached a representative of Parkside by the name of Lucas on a call she initiated on September 14, 2018. Lucas faxed Medina the loss mitigation packet on September 17, 2018, to the fax number Medina had previously provided on September 10, 2018. On September 27, 2018, Plaintiffs emailed the completed package to the email address provided by Parkside pursuant to the instructions on the loss mitigation form. Parkside confirmed receipt of the loss mitigation packet via email (sent to the email address Medina provided on September 10, 2018).

On September 27, 2018, Medina received a letter from Parkside at her work address sent via USPS regular mail. The letter stated that the Property was set for foreclosure sale within 15 days and that the loss mitigation paperwork she had submitted would not be reviewed. Plaintiffs assert

this was the first time any of them received written notification that the Property was set for foreclosure sale. On October 1, 2018, Medina initiated a call with Parkside's representative ("Horton") and explained her confusion about a pending foreclosure sale date and asking why the law firm did not send her written notification. Horton told Medina that he believed the sale was on hold, but then realized that the sale of the Property was set for the following day. Horton identified the law office conducting the foreclosure process as Albertelli Law, a different law firm than identified before, and gave Medina their phone number. Horton stated that he and his manager would expedite the loss mitigation packet received to the underwriting department, leaving Medina to believe that the foreclosure sale of her home the next day would be stopped or at a minimum placed on hold until the underwriting department had been granted a chance to review Plaintiffs' application. Medina also contacted the phone number provided for Albertelli Law, but was unable to reach anyone able to provide Medina with any information about placing the sale of the Property on hold. On October 2, 2018, Medina again called Parkside, where a representative informed her there was no way to stop the sale. On October 10, 2018, Medina learned from Parkside's representative that the home had sold on October 2, 2018, at the foreclosure auction. Medina was also informed that the loss mitigation packet was designated "complete, pending review" by the underwriting department of Defendant on October 3, 2018.

On October 16, 2018, Medina again called Parkside, who transferred her to Defendant Cenlar's representative and call center manager, who connected Medina with Regina Rodriguez, a representative of Albertelli Law, in a three-way call. Rodriguez gave Medina the certified mail tracking numbers for letters sent to all Plaintiffs on September 10, 2018, to the Property address and confirmed that each letter was returned to Albertelli "unclaimed/return to sender."

Plaintiffs filed this suit in state district court in Williamson County, Texas on November 9, 2018, and Defendants removed it to this Court on February 13, 2019. Plaintiffs bring a host of claims: breach of contract; violations of The Real Estate Settlement Procedures Act of 1974 (RESPA) and underlying regulations; violations of the DTPA; and the tort of "outrage." They seek actual damages in the amount of $1,086,004.70 for loss of equity in the home; medical expenses incurred for the treatment of Pamela Schmidt and Amber Medina's breast cancer; Medina's psychiatric treatment; Medina's loss of income; loss of credit availability; and emotional distress. Plaintiffs further seek in excess of $675,000 in exemplary damages for Defendants' alleged violations of RESPA. Plaintiffs are proceeding pro se. Defendants Parkside and Cenlar move to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. Rule 12(b)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss an action for failure to state a claim upon which relief can be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted), *cert. denied*, 552 U.S. 1182 (2008). The Supreme Court has explained that a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [nonmovant] pleads factual content that allows the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." *Id.* The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are

central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## III. ANALYSIS

**A.     DTPA Claim**

Defendants move to dismiss Plaintiffs' Deceptive Trade Practices Act claim, asserting that an extension of credit does not qualify as a "good" or "service" pursuant to the DTPA. Plaintiffs' response is to request that the Court follow the law of other states. Dkt. No. 57 at 9. As the applicable law is Texas law, the Court does not have the discretion to do so.

A DTPA claim requires the plaintiff to prove: (1) she is a consumer; (2) Defendants engaged in false, misleading, or deceptive acts; and (3) these acts caused plaintiff damages. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). To be a "consumer," a person "must seek or acquire goods or services by lease or purchase" and "the goods or services sought or acquired must form the basis of [that person's] complaint." *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 159 (Tex. App. – Fort Worth 2007, pet. denied)). "Usually a loan transaction cannot be challenged under the DTPA because the plaintiff sought or acquired money, which is not a good or a service." *Whittier v. Ocwen Loan Servicing*, LLC, 2013 WL 5425294, at *7 (S.D. Tex. Sept. 25, 2013). "A mortgage loan is not within the DTPA when the loan, rather than the property sought to be purchased, is the basis of the plaintiff's complaint." *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 725–26 (5th Cir. 2013). In this case, Plaintiffs complain about the servicing received in conjunction of their nonpayment and foreclosure of their home loan. Thus, under Texas law they do not qualify as "consumers" for purposes of the DTPA and therefore cannot state a claim under that statute. *See Fowler v. U.S. Bank, Nat. Ass'n*, 2 F. Supp. 3d 965, 974-975 (S.D. Tex. 2014).

**B.     RESPA Claims**

Plaintiffs also bring claims pursuant to various sections of RESPA and the concordant Code of Federal Regulations promulgated thereunder. In their motion to dismiss, Defendants assert that: (1) Plaintiffs have no private right of action for claims brought pursuant to 12 CFR §§ 1024.35, 1024.38, 1024.39 or 1024.40; (2) Plaintiffs cannot assert a claim pursuant to 12 CFR § 1024.35 or § 1024.36 because Plaintiffs' communications were sent to the wrong address; and (3) Plaintiffs cannot assert a claim for violation of § 1024.41 because the loss mitigation application was not submitted 37 days prior to the scheduled sale, as required.

   **1.     No Right of Private Action**

Plaintiffs do not respond to Defendants' argument that there is no private right of action under 12 CFR § 1024.35, § 1024.38, § 1024.39. or § 1024.40. Failure to respond to an argument in a motion to dismiss constitutes waiver of that issue at the district court. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006); *Kellam v. Servs.,* 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), aff'd sub nom., *Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014). By failing to address this argument, Plaintiffs abandoned these claims. Defendants are, therefore, entitled to dismissal with prejudice of these claims. *See Arkansas v. Wilmington Tr. Nat'l Ass'n,* 2020 WL 1249570, at *5 (N.D. Tex. Mar. 16, 2020); *Mayo v. Halliburton Co.*, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010).

   **2.     Communication Sent to Incorrect Address**

Plaintiffs claim that Defendants violated 12 CFR § 1024.35 and § 1024.36 because they failed to respond to qualified written requests ("QWRs"), requests for information, and notices of error submitted to Cenlar's general web information portal. Defendants argue that Plaintiffs cannot

7

bring a claim under these sections because their communications regarding the loss mitigation package and foreclosure were sent to the incorrect address. Plaintiffs' concede in their Response that their communications were sent to the wrong address, but argue that "said facts are no longer germane to this case" because "Defendants admit in discovery that they faxed a loss mitigation package to Plaintiffs on September 7, 2018" and "Defendants' documents produced during discovery [show] that Defendants and Attorney Defendant considered the foreclosure sale unlawful while a loss mitigation package was active, regardless of submission dates or address miscommunications by either party." Dkt. No. 57 at 10.

RESPA is a consumer-protection statute, *see Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012), and it imposes short timeframes for mortgage servicers to respond to potentially detailed inquiries. To aid servicers with this task of providing consumers with timely information, RESPA's implementing regulations allow, but do not require, servicers to establish a designated address for QWRs. 24 C.F.R. § 3500.21(e)(1) ("By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests."). The final rulemaking notice for the operative regulation, Regulation X, explained that if a servicer establishes a designated QWR address, "then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed.Reg. 65,442, 65,446 (Dec. 19, 1994).

Where a servicer complies with the notice requirements for designating an exclusive QWR office and address, a letter sent to a different office and address is not considered a QWR under

RESPA.[3]  This means that "where the servicer has established a separate and exclusive office and address for the receipt and handling of QWRs, that servicer's duty to respond is triggered only if the borrower sends his or her written request to the designated office and address." *Geoffrion,* 182 F. Supp. 3d at 658 (citing *Berneike*, 708 F.3d at 1148–1149); *see Roth*, 756 F.3d at 181 ("[I]f a servicer establishes a designated QWR address, then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'") (citation omitted).  Plaintiffs concede that they did not send their requests to the address designated by Cenlar or Parkside under RESPA. However, they complain that they could not find that address because it was not on Defendants' websites and none of the Defendants they contacted gave them the QWR address.

Defendants respond that 12 CFR §§ 1024.35 and 1024.36 only require a mortgage servicer to put its designated address on its website if the website includes a contact address, and Cenlar's does not. 12 C.F.R. § 1024.35(c) provides as follows:

> (c) Contact information for borrowers to assert errors. A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in this section. The notice shall include a statement that the borrower must use the established address to assert an error. If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b). A servicer shall provide a written notice to a borrower before any change in the address used for receiving a notice of error. ***A servicer that designates an address for receipt of notices of error must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.***

---

[3]*Geoffrion v. Nationstar Mortgage LLC*, 182 F. Supp. 3d 648, 658 (E.D. Tex. 2016); *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181–82 (2d Cir. 2014); *see Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 (10th Cir. 2013); *Allen v. Dovenmuehle Mortg., Inc.*, 2014 WL 3579812, at *8 (N.D. Tex. July 21, 2014); *Steele v. Green Tree Servicing, LLC*, 2010 WL 3565415, at *3 (N.D. Tex. Sept. 7, 2010), aff'd sub nom. *Steele v. Green Tree Servicing, L.L.C.*, 453 Fed.Appx. 473 (5th Cir. 2011).

12 C.F.R. § 1024.35(c) (emphasis added). Similarly, 12 C.F.R. § 1024.36(b) provides:

> Contact information for borrowers to request information. A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to request information in accordance with the procedures in this section. The notice shall include a statement that the borrower must use the established address to request information. If a servicer designates a specific address for receiving information requests, a servicer shall designate the same address for receiving notices of error pursuant to § 1024.35(c). A servicer shall provide a written notice to a borrower before any change in the address used for receiving an information request. ***A servicer that designates an address for receipt of information requests must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.***

12 C.F.R. § 1024.36(b) (emphasis added). However, Plaintiffs plead in their First Amended Complaint that, "The QWR specific address is not listed on the general websites for Defendants, at https://www.cenlar.com or https://www.parksidelending.com, which include Defendants' main addresses and customer service telephone numbers." Dkt. No. 22 at 38. On a Rule 12(b)(6) motion the Court must accept the facts of the complaint as true, and may not consider competing factual claims presented by the movant. Plaintiffs' pleadings allege facts that, if true, render the defense raised by the Defendants—that because Plaintiffs sent their communications to the wrong address they had no duty to respond to them—unavailable to the Defendants. If Parkside and Cenlar believe they can prove this allegation to be untrue, that is something more appropriately addressed in a motion for summary judgment. The motion on this issue should therefore be denied.

### 3.     Dual Tracking Claim

Next, Defendants' argue that Plaintiffs cannot assert a claim for a "dual tracking" violation under 12 CFR § 1024.41, the regulation that governs loss mitigation procedures under RESPA. "Dual tracking is a term given to situations in which the lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options." *Gresham v. Wells Fargo Bank,*

*N.A.*, 642 F. App'x 355, 359 (5th Cir. 2016). To establish a claim for dual tracking, a plaintiff must plead that the servicer received a complete loss mitigation application more than 37 days before a foreclosure sale. *See id.*; *see also* 12 C.F.R. § 1024.41(g). Plaintiffs in this case plead that they submitted the loss mitigation package September 27, 2018—five days before the scheduled foreclosure sale on October 2, 2018. Defendants contend that because the package was submitted only five days before the foreclosure sale, 12 CFR § 1024.41 is inapplicable. Plaintiffs respond that Defendants have admitted in their pleadings that they faxed a loss mitigation package to Plaintiffs on September 17, 2018, and that "Defendants' documents produced during discovery" show that the Defendants and their attorney considered the foreclosure sale "unlawful while a loss mitigation package was active, regardless of submission dates." Dkt. No. 57 at 10. Plaintiffs assert that Defendants have thus admitted to dual tracking, a violation of 12 CFR § 1024.41.

Defendants point out that the language quoted above is contained in Plaintiffs' response to the motion to dismiss, and not their live complaint. Defendants contend that the Court should therefore ignore those allegations when considering the motion to dismiss. All that would be left if the Court disregards these claims are allegations establishing that Plaintiffs did not submit the loss mitigation package more than 37 days before the foreclosure sale date, which is an essential element of the dual tracking claim. Defendants are correct that in the ordinary case a court should not consider new arguments raised in the response to a motion to dismiss, as the response is technically not part of the complaint. But where a plaintiff is proceeding pro se, her pleadings are held to "less stringent standards than formal pleadings drafted by lawyers" and must be liberally construed. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Thus, the Fifth Circuit has approved of a court considering matters contained in a response to a motion to dismiss as part of the pleadings, where

11

the plaintiff was pro se. *See United States v. Trevino*, 554 F. App'x 289, 293 n.9 (5th Cir.2014) (district court should construe new issues raised in reply to a responsive pleading as a motion to amend the complaint). Thus, in a recent case in the Eastern District of Texas, a district judge accepted the recommendation of a magistrate judge, who had concluded that

> because [the plaintiff] is proceeding pro se, the undersigned is required to "look beyond her formal complaint and to consider as amendments to the complaint those materials subsequently filed." *Howard v. King*, 707 F.2d 215, 220 (5th Cir.1983), citing *McGruder v. Phelps*, 608 F.2d 1023, 1025 (5th Cir.1979). Therefore, considering [plaintiff's] pro se status, and taking her allegations in her complaint and response to the motion to dismiss as true, the undersigned finds she has adequately pled [her claim].

*Randolph v. Pinecrest Retirement Communities*, 2015 WL 6725322 at *3 (E.D. Tex. Nov. 3 2015).

Following this principle, and taking into account the allegations of the complaint and the statements in the response to the motion to dismiss, the Court concludes that the Plaintiffs have stated enough facts to make out a plausible claim that the Defendants agreed to consider the late-filed mitigation package before the foreclosure sale. As with the previous claim, Defendants' contention that the facts do not support that assertion is something that must be raised in a summary judgment motion.

**C.     Breach of Contract Claim**

Defendants argue that Plaintiffs' breach of contract claim should be dismissed because Plaintiffs pled that they failed to make payments on their loan and loan modification agreement, and under Texas law a borrower cannot maintain a breach of contract claim when he or she is in default. In Texas, there are four essential elements to a breach of contract claim: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the

12

defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009).

Plaintiffs pled that their last loan payment was in March of 2018, acknowledging their default. Dkt. No. 22 at 7. Additionally they plead, "Plaintiffs defaulted on said loan agreement due to unforeseen major health complications." *Id.* at 14. Plaintiffs cannot prevail on a breach of contract claim when they are in default of their obligations under the contract. *Villareal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016). The Court finds that Plaintiffs' breach of contract claim is properly dismissed with prejudice.[4]

## D.  Personal Tort Claims

Plaintiffs bring a claim for the tort of "outrage"—a claim that does not exist under Texas law. Plaintiffs assert they suffered emotional distress because Defendants provided misinformation and misdirection to Plaintiffs during the foreclosure process, Defendants sent notifications to the wrong address, their home was foreclosed upon, and they were not allowed to modify their loan for a second time. Since they are proceeding pro se, the Court is to construe the Plaintiffs' allegations liberally. The closest claim in Texas to that the Plaintiffs are raising is the tort of intentional infliction of emotional distress. The elements of a claim for intentional infliction of emotional distress under Texas law are that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was "extreme and outrageous"; (3) the defendant caused the plaintiff to suffer

---

[4]Plaintiffs additionally plead that "Defendant Albertelli sent one foreclosure sale notice to each Plaintiff in bare minimum compliance with §51.002 of the Tex. Prop. Code. . . a full 48 days prior to the foreclosure sale date." Dkt. No. 22 at 14. This pleading supports that Plaintiffs were provided with the notice in compliance with the requirements the applicable law, so they cannot allege breach on these bases. S*ee Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 256 (5th Cir. 2013) (holding that, under Section 51.002 of the Texas Property Code, service of a notice "is complete when the notice is sent via certified mail" and that "[t]here is no requirement that [the debtor] receive the notice").

emotional distress; and (4) that emotional distress was severe. *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006).

Whether a defendant's conduct is "extreme and outrageous" is a question of law. *Brewerton v. Dalrymple*, 997 S.W.2d 212, 216 (Tex. 1999). To be "extreme and outrageous," the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) (quotation marks and citation omitted). With this heightened standard in mind, "courts have rejected claims asserting intentional infliction of emotional distress where defendants simply exercised rights owed under mortgage loan documents." *Garza v. Deutsche Bank Tr. Co. Ams.*, 2012 WL 13029409, at *6 (W.D. Tex. Oct. 24, 2012); *Motton v. Chase Home Fin.*, 2012 WL 2886718, at *4 (S.D. Tex. July 13, 2012); *Auriti v. Wells Fargo Bank, N.A.*, 2013 WL 2417832, at *8 (S.D. Tex. June 3, 2013) ("The actions of a financial institution attempting to enforce its contractual right to foreclose on a deed of trust under which the homeowner has defaulted, without more, do not meet the high bar of 'outrageous' behavior."). Given this case law, Defendants' conduct in enforcing their right to foreclose on Plaintiffs' property was not extreme and outrageous as a matter of law, and this claim should be dismissed with prejudice.

## IV. RECOMMENDATION

For the reasons set forth above, the Court **RECOMMENDS** that Defendants Parkside Lending LLC and Cenlar FSB's Amended Motion to Dismiss First Amended Complaint (Dkt. No. 55) be **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is recommended that the motion be **DENIED** as to Plaintiffs' dual tracking claim, and the claim that Defendants violated 12 CFR § 1024.35 and 12 C.F.R. § 1024.36, and be **GRANTED WITH PREJUDICE** as to all other

claims. Finally, the Clerk is directed to remove this case from the undersigned's docket and return it to the docket of the Honorable Robert Pitman.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)©; *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 23rd day of July, 2020.

                                                          ANDREW W. AUSTIN
                                                         UNITED STATES MAGISTRATE JUDGE